NEW YORK, S. & W. R. CO. v. THIERER (two cases).

(Circuit Court of Appeals, Second Circuit. January 12, 1915.)

Nos. 111, 112.

1. NEGLIGENCE ⊂⊃65—"CONTRIBUTORY NEGLIGENCE"—NATURE AND ELEMENTS —"ORDINARY CARE."

"Contributory negligence," which will defeat recovery for a personal injury following negligence of the defendant, is the absence of "ordinary care," which is such care as an ordinarily prudent person would exercise under the same or similar circumstances.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 83, 94; Dec. Dig. ⊂⊃65.

For other definitions, see Words and Phrases, First and Second Series, Contributory Negligence; Ordinary Care.]

2. NEGLIGENCE ⊂⊃136—ACTIONS FOR NEGLIGENCE—QUESTIONS FOR JURY.

The question of negligence or contributory negligence is one of law for the court only when the facts, conceded or established, are such that all reasonable men must draw the same conclusion from them.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 277-353; Dec. Dig. ⊂⊃136.]

3. RAILROADS ⊂⊃350—INJURY TO PERSON AT CROSSING—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

Plaintiff started to walk across defendant's railroad tracks at a crossing in a city. There were three tracks running north and south; the one to the east being a storage track, the second a siding or passing track, and that to the west a main single track. Plaintiff was familiar with the crossing, and testified that when she approached from the east there were coal cars standing on both the first and second tracks, close to the crossing on both sides, those on the second track being parts of a train which had been cut; that before crossing each of such tracks she stopped and looked and listened, but could not see in either direction on account of the cars; that she heard nothing, except an engine puffing to the northward; that as she passed over the second crossing she stooped forward to look to the northward, when she was struck by the overhang of an engine or its tender which was backing from the south. The distance between the rails of the second and main tracks was 7 feet. Held, that on the evidence the question of contributory negligence was one for the jury.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152-1192; Dec. Dig. ⊂⊃350.]

In Error to the District Court of the United States for the Eastern District of New York.

These causes come here on writs of error to the United States District Court for the Eastern District of New York, to review judgments entered on April 4, 1914, against the New York, Susquehanna & Western Railroad Company and in favor of the plaintiff in each action.

The plaintiffs below, hereinafter called plaintiffs, are residents of the state of New Jersey. The defendant below, hereinafter called defendant, is a corporation duly organized and existing under the laws of the states of New Jersey and Pennsylvania, and it maintains an office within the city, county, and state of New York. By stipulation the cases were tried together and one bill of exceptions was signed.

See, also, 209 Fed. 316, 126 C. C. A. 242.

Stetson, Jennings & Russell, of New York City (William C. Cannon, of New York City, of counsel), for plaintiff in error.

Emmanuel A. Busch (Abram J. Rose and Alfred C. Pette, both of New York City, of counsel), for defendant in error.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. These are tort actions brought to recover damages. The action brought by Annie Thierer is to recover for severe and permanent injuries to her left leg, which resulted in its amputation between the ankle and the knee, and for other serious injuries about the head, body, and limbs, as well as for severe shock to her nervous system, for all of which she alleged she had sustained damage in the sum of $50,000. The action brought by her husband, Joseph Thierer, is to recover for the consequential loss of his wife's services and society, and for the expenses he incurred for medical attention to her and for nursing, for all of which he demanded judgment in the sum of $20,000. The jury brought in a verdict for the wife in the sum of $6,500 and for the husband in the sum of $4,040.40. The injuries which the wife suffered confined her to the hospital for six weeks, and made necessary the attendance of a doctor for a year after she was able to leave the hospital for her home, and ever since the accident she has found it necessary to use crutches, testifying that since the accident she had never been able to go without them.

The defense of contributory negligence is relied upon to defeat the actions. When such a defense is to be interposed, there has been some question in the authorities whether it is admissible under a general plea of not guilty or must be specially pleaded. This court held in Canadian Pacific Ry. Co. v. Clark, 73 Fed. 76, 81, 20 C. C. A. 447 (1896), that the rule in force in the state in which the action is tried should determine whether such a defense can be availed of under a general traverse. In the case at bar there is no question of this sort, as Mrs. Thierer alleged in her complaint that while she was "lawfully and carefully crossing the highway" she was struck and knocked down by an engine attached to railway cars controlled or operated by defendant and sustained various injuries solely by reason of the negligence of the defendant. The defendant in its answer alleged that the injury was caused or contributed to by the plaintiff's own negligence or want of care.

The defendant at the close of the plaintiff's case, and again when the testimony closed, moved the court to dismiss the complaint on each and all of the following grounds: (1) That the plaintiff had not established a cause of action against the defendant. (2) That the plaintiff was guilty of contributory negligence as a matter of law. (3) That upon the whole case the plaintiffs were not entitled to recover.

The defendant also moved to direct a verdict in its favor in each case upon the ground: (1) That the plaintiff had not established a cause of action against the defendant. (2) That the plaintiff was guilty of contributory negligence as a matter of law. (3) That it had not been established that defendant was guilty of any negligence. (4) That upon the whole case the plaintiffs were not entitled to recover.

These motions were overruled; the court stating that it would leave the questions of fact to the jury. The jury was instructed that the burden rested on the plaintiff to show that she was entitled to a verdict; that the burden was on her to use care in going across the railroad crossing. In the course of the charge it was said:

"Now, as to the railroad's duty, as I have charged you, you have got to find whether the railroad was negligent or careless, or failed to perform its duty as it should have, before the plaintiff can recover, just as much as you have to find that the plaintiff was not herself to blame for what did occur. I have charged you as to a number of matters in which the railroad did not owe the duty of doing anything more than just to run its trains carefully, so far as keeping them on the track and handling the cars are concerned."

The jury also was instructed:

"If there is a fair preponderance of testimony showing that the railroad company created the situation in which there was a dangerous crossing at that time, in which there was danger from the train coming from the south, and indication of a train from the north, which would deceive some one, if the defendant did not (through the servants that were there and in control of the situation) perform its duty in either preventing the train from running upon some one who could not get out of the way, or in preventing that some one from crossing the track, then the defendant did not perform its duty, and if that was the cause of the accident, and if Mrs. Thierer was not to blame herself, then she can recover."

The jury was fully instructed as to the duty of a traveler upon the highway before crossing a railroad to look and listen and use reasonable care, and that "the greater the difficulty of discovering the danger as apparent from the surroundings, the greater the care required." There was no error in the court's charge, unless the court was in error in submitting the case to the jury, instead of deciding that the plaintiff as a matter of law had been guilty of contributory negligence.

The defendant was charged with negligence for failing to ring a bell or blow a whistle as required by statute while the train was approaching the crossing. The verdict of the jury establishes the charge. If the question of the negligence of Annie Thierer was for the jury, the verdict of the jury also establishes the fact that she was not guilty of contributory negligence.

These cases are in this court for the second time. When they were here on the first appeal, we held upon the evidence then before us that Annie Thierer had been guilty, as a matter of law, of contributory negligence. As the injury was inflicted in the state of New Jersey, we held the law of that state applicable to the case, and that under the decisions of its highest court pedestrians, before crossing railroad tracks at grade, were required to look and listen, and we observed that the plaintiff in her testimony "said absolutely nothing about listening, except that she did not hear any bell or whistle." We said:

"The law applicable to the case is, of course, that of the state of New Jersey, where it arose. The highest court of that state holds that pedestrians, before crossing railroad tracks at grade, must look and listen. Mrs. Thierer said absolutely nothing about listening, except that she did not hear any bell or whistle. In respect to looking, she said again and again that, while walking at her ordinary gait, she looked to the south, and was struck by the train backing up from that direction the moment she looked. Of course, at that moment, she must have been within the overhang of the train, the very situation that the rule as to looking and listening is intended to prevent. She did

not look before she crossed. Such looking and listening as she gave amounts to not looking or listening at all. If looking and listening after one is on the track satisfies the rule, it might as well not exist." 209 Fed. 316, 126 C. C. A. 242.

There can be no doubt that a person is guilty of contributory negligence as matter of law who attempts to cross the tracks of a railroad without either looking or listening when the law of the jurisdiction requires the traveler to do both and he does neither.

[1] It is not questioned that, if the negligence of Annie Thierer contributed to the injury which she received, she is not entitled to recover. The general rule, of course, is that, if the negligence of the injured person contributed in any degree to the injury received no recovery can be had (Fletcher v. Boston, etc., R. Co., 187 Mass. 463, 73 N. E. 552, 105 Am. St. Rep. 414; Gonzales v. N. Y., etc., R. Co., 38 N. Y. 440, 98 Am. Dec. 58; Oil City Fuel Supply Co. v. Boundy, 122 Pa. St. 449, 15 Atl. 865; Mauch v. Hartford, 112 Wis. 40, 87 N. W. 816), although in some of the states it has been held that, to defeat a recovery on the ground of contributory negligence, the negligence must have contributed in an essential degree to the injury sustained (Birge v. Gardner, 19 Conn. 507, 50 Am. Dec. 261; Northern Central R. Co. v. State, 29 Md. 420, 96 Am. Dec. 545).

But what do the courts mean when they say that contributory negligence will defeat a recovery? They mean simply this: That the law imposes on every person the duty of using ordinary care for his or her own protection against injury. Beers v. Housatonuc R. Co., 19 Conn. 566; Graham v. Pennsylvania Co., 139 Pa. 149, 21 Atl. 151, 12 L. R. A. 293; Gulf, etc., R. Co. v. Shieder, 88 Tex. 152, 30 S. W. 902, 28 L. R. A. 538. The law does not require the exercise of extraordinary care. Tobin v. Omnibus Cable Co., 4 Cal. Unrep. 214, 34 Pac. 124 (1893); Drake v. Dartmouth, 25 Nova Scotia, 177. And it does not demand the utmost possible caution. Chicago, etc., R. Co. v. Bailey, 66 Kan. 115. Where there has been the exercise of ordinary and reasonable care, there can be no contributory negligence. The courts have defined ordinary care as such care as ordinarily prudent persons would have exercised under the same or similar circumstances to avoid danger. Chicago Union Traction Co. v. Chugren, 209 Ill. 429, 70 N. E. 573; Salter v. Utica, etc., R. Co., 88 N. Y. 42; Patrick v. Pote, 117 Mass. 297; Davis v. Concord, etc., R. Co., 68 N. H. 247, 44 Atl. 388. And the courts have said that in determining whether a plaintiff has used ordinary care, the age, sex and physical condition of the person injured may be taken into consideration. Hickman v. Missouri Pac. R. Co., 91 Mo. 433, 4 S. W. 127; Asbury v. Charlotte Electric R. Co., 125 N. C. 568, 34 S. E. 654. In Wakelin v. London, etc., R. Co., 12 App. Cas. 41 (1886), Lord Fitzgerald in the House of Lords declared that contributory negligence consists in—

"the absence of that ordinary care which a sentient being ought reasonably to have taken for his own safety and which had it been exercised would have enabled him to avoid the injury of which he complains, or the doing of some act which he ought not to have done, and but for which the calamity would not have occurred. I have used the words 'ordinary care'; extraordinary caution is not required, but if by the use of ordinary care he might have avoided the injury, and did not, he is not entitled to recover damages."

[2] The question when contributory negligence is for the jury and when it is for the court has been before the Supreme Court in a number of cases. In Texas Pacific Ry. Co. v. Harvey, 228 U. S. 319, 33 Sup. Ct. 518, 57 L. Ed. 852 (1913), the rule on this subject was stated as follows:

"It has often been held in this court that ordinarily negligence or contributory negligence is not a question of law, but of fact, to be settled by the finding of the jury. Where there is uncertainty as to the existence of negligence or contributory negligence, whether such uncertainty arises from a conflict of testimony, or because, the facts being undisputed, fair-minded men might honestly draw different conclusions therefrom, the question is not one of law."

And in Gardner v. Michigan Central R. R. Co., 150 U. S. 349, 14 Sup. Ct. 140, 37 L. Ed. 1107 (1893), the court declared:

"The question of negligence is one of law for the court only where the facts are such that all reasonable men must draw the same conclusion from them, or, in other words, a case should not be withdrawn from the jury unless the conclusion follows as matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish."

In Cowen v. Crabow, 120 Fed. 258, 57 C. C. A. 39 (1903), in speaking of the refusal of the trial judge to instruct the jury to find for the defendant on account of the contributory negligence of the plaintiff, the Circuit Court of Appeals in the Sixth Circuit said:

"This could only have been done if, from the evidence, all reasonable men would have drawn the conclusion that the plaintiff did not exercise that degree of care which, under the circumstances, a prudent person should have exercised."

And in Shatto v. Erie R. Co., 121 Fed. 678, 59 C. C. A. 1 (1903), the same court said:

"The question of contributory negligence becomes one of law only when fair-minded men, from the established or conceded facts, would draw the conclusion of a want of ordinary care. Where opposing inferences may be drawn, the question of negligence, under proper instructions, must be submitted to the jury."

The rule is laid down in Shearman & Redfield on Negligence (6th Ed.) vol. 1, § 114, as follows:

"It is a general rule, applicable in all courts, that the question is to be submitted to the jury, not only where there is sufficient testimony as to the actual facts to leave a reasonable doubt, but also where the inferences which might be fairly drawn from the facts are not certain and invariable and might lead to different conclusions in different minds. The court is not at liberty to withhold the question from the jury, simply because it is fully convinced that a certain inference should be drawn, so long as persons of fair and sound minds might possibly come to a different conclusion."

In Cincinnati, N. O. & T. P. Ry. Co. v. Farra, 66 Fed. 496, 13 C. C. A. 602 (1895), a case before the Circuit Court of Appeals in the Sixth Circuit and decided by Judges Taft, Lurton, and Severens, the facts were as follows: The person injured was driving across the tracks of a railroad at a public road crossing at grade; the last point from which one traveling the turnpike could see the tracks before coming to the crossing was 400 feet from the crossing, at a point where the road began to descend a hill to the railroad; the obstruction of view

was due to the effect of the cuts through which both the railroad and turnpike approached the crossing, and the right of way had been suffered to grow up in undergrowth and rank weeds, so that one driving could not see to the right or left until the horse pulling the barouche was over the first rail; the woman drove down the hill in a walk, and from the time she started down the hill was attentive to the situation; she had no view of the track (except the view 400 feet back) until she got on the track; she did not hear the approach of the train; when she got on the track, she looked south first, as no train was regularly due at that time from the north; then she looked' north and saw an engine approaching, and so near that there was no time to cross over or to withdraw, and the collision occurred.   The trial court was asked to instruct as follows:

"The jury is instructed that a railroad track is of itself notice of danger, and a warning to persons approaching a railroad crossing to look out for trains running on the railroad, and that it is the duty of a person approaching a railroad crossing to make a vigilant use of his senses in looking for a train approaching the crossing on the railroad, and to use care commensurate with the character and apparent danger of the crossing in order to ascertain if a train is approaching a crossing on a railroad; and if the view of the railroad is obscured by intervening objects, it is the duty of the traveler upon the highway, before going upon the railroad track, to stop and look and listen for an approaching train; and if such traveler under such circumstances fails to stop and look and listen, and without so doing goes upon the track and is injured by a train running on said railroad track, which injuries would not have been sustained, except for the failure to stop and look and listen, then the jury must find for the defendant, even though the jury believes from the evidence that there was a failure by the employés operating the train to give notice by signals of the approaching train to the crossing.'

This instruction was refused, and the question of the negligence of the plaintiff was left to the jury; the court saying:

"That was a public highway. She had the right to travel upon it and cross this crossing, but she was under obligation, in duty bound, to the relative right which the company had of its right of way, to use care and prudence herself. She could not and cannot claim damage if she has herself been careless or imprudent in approaching and attempting to cross that right of way, and by that I mean such prudence and caution as reasonably careful persons would take under similar circumstances."

In the above case the plaintiff recovered a verdict for $5,000, an appeal was taken, and the judgment was affirmed, notwithstanding the fact that, as she reached the track, she had not stopped for the purpose of looking and listening.

In Grand Trunk Railway Co.. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485 (1892), the facts were as follows: The action was brought by the administrator of a person killed by a train at a point where its tracks crossed a highway at grade; there were obstructions along the right side of the highway for 300 feet before reaching the crossing, the obstructions consisting of houses and outbuildings and an orchard; it was not until 'a traveler was within 15 or 20 feet of the track, and then going upgrade, that he could get an unobstructed view of the track; the deceased had been accustomed to cross the tracks every day for several years; at the time of the accident he was driving in a buggy with the top raised and the side curtains either raised or

removed; about 76 feet from the track he stopped for several minutes, "presumably for any trains that might be passing," and while so waiting a train passed along one of the tracks; he then drove on, and while apparently watching the train that had passed drove on the tracks and was struck by a train on another and parallel road. And in this case the question of contributory negligence was left to the jury. While it is true the deceased in the Ives Case stopped some 75 or 80 feet before reaching the crossing, the evidence showed that he had at that point no view of the tracks, and could not get a view of them until he was within 15 or 20 feet of the crossing. The trial court instructed the jury:

"You fix the standard for reasonable, prudent, and cautious men under the circumstances of the case as you find them, according to your judgment and experience of what that class of men do under these circumstances, and then test the conduct involved and try it by that standard; and neither the judge who tries the case nor any other person can supply you with the criterion of judgment by any opinion he may have on that subject."

And the Supreme Court, after quoting the above instruction, said:

"But it seems to us that the instruction was correct, as an abstract principle of law, and was also applicable to the facts brought out at the trial of the case. There is no fixed standard in the law by which a court is enabled to arbitrarily say in every case what conduct shall be considered reasonable and prudent, and what shall constitute ordinary care, under any and all circumstances. The terms 'ordinary care,' 'reasonable prudence,' and such like terms, as applied to the conduct and affairs of men, have a relative significance, and cannot be arbitrarily defined. What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is then province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court."

[3] After this examination into the rules of law applicable to cases of this nature, let us look into the facts as disclosed at the second trial. The defendant's railroad runs through North Paterson, in the borough of Hawthorne, in the state of New Jersey; and here the accident complained of occurred, at a point where the defendant's tracks crossed Second street. At this place the defendant has three tracks, which run north and south and cross Second street at right angles. The first track to the east was a storage track, the second was a passing siding, and the third was the main line of a single track road. The width of the storage track from rail to rail is 4 feet 8½ inches. The distance from the west rail of the storage track to the east rail of the passing siding is 6 feet 10¾ inches. The width of the passing siding from rail to rail is 4 feet 8½ inches. The space between the west rail of the passing siding and the east rail of the main line is 7 feet 7¼ inches, and the width of the main line from rail to rail is 4 feet 8½ inches. The crossing at the time of the accident was not protected by either gates or flagman, nor was there an automatic bell to warn of the approach

of trains. Annie Thierer approached these tracks from the east and was walking toward the west between 5 and 6 o'clock p. m. on September 26, 1911, intending to cross the tracks at the Second street crossing. As she approached the crossing she found the first track filled with coal cars on either side of the crossing and almost up to the edge of the crossing. And on the second track she found a long coal train, consisting of 39 cars. The second track would not accommodate all of these cars, and some 8 or 9 of the cars, together with the engine, overran the switch at the north end and were out on the main line. The train had been cut at the crossing, the coal cars reaching up to the crossing on the south side, and the same condition practically existed on the north, so that her view to both north and south was almost entirely obstructed. The tracks crossed the street at grade, and she was familiar with the crossing, and accustomed to seeing and hearing trains pass over the tracks, and had herself frequently passed over them. She testified that when she came to track No. 1 she looked in both directions and listened, but could not see anything, as the cars were lined up on both sides and obstructed her view. She says she listened and did not hear a whistle or bell. She stated that when she came to the second track she again stood and looked and listened, and heard the puffing of an engine towards North Paterson. She was asked, "When you came to the second track and stood, where did you stand on that track?" and she answered, "I don't exactly know where I stood; but I stood and listened before I came to that track." Then she was asked: "Do you mean to say you stood before you got to the track or when you got on the track?" To which she replied: "I stood before I came to the track, because I couldn't see in either direction." When she looked south the freight cars, she testified, obstructed her view, and when she looked north the freight cars on that side of the crossing also obstructed her view in that direction. She then started towards the third track, taking a few steps in that direction. "I gave a few steps," she testified, "and leaned over to look and see if there was any train coming, and as I leaned over to look I got hit by an engine from the opposite direction, coming from the south." The engine was, however, running backward, with the tank between the engineer and the crossing. She was asked how near she was to the third track when she leaned over to look north, and she answered that she could not exactly say, but she should say "about the center," by which she evidently meant midway between the west rail of the second track and the east rail of the third track. She stated that she could not see north or south for any distance because of the obstruction to her vision caused by the freight cars. The testimony showed that from a point on the east rail of the second track she could see south only 25 feet, and from the center of that track she could see only 34 feet. She listened and heard nothing coming from the south, but did hear the puffing of an engine towards the north. As she could not see the third track, either to the north or to the south, because of the freight cars, she leaned over to get a view of the track to the north; that being the direction from which sounds of the puffing engine came. In doing so she projected her body within reach of the overhang of

an engine and cars coming from the opposite direction, and which according to her testimony rang no bell and sounded no whistle. At the moment she was hit she was still looking toward the north, not having had time to look toward the south, and was leaning over. On cross-examination she was asked: "That is, you were still looking towards North Paterson when you got hit?" To which she answered: "I looked in both directions, but couldn't see far; I only could see ahead of me." Again she was asked on the redirect examination: "You started to say that, as you left the second track and you took the two steps, you continued looking?" To which she answered: "Yes." "In both directions?" she was asked, and replied, "Yes." "In which direction?" "Both directions." "Up and down the track?" "Yes." "And listening?" "Yes." She was asked, referring to the time when she crossed the second track, "You gave a few steps and looked to the north?" Her answer was: "Towards North Paterson." "And then you looked toward the south?" To which she replied: "No." "But, as you were going to, you were struck?" She answered: "Yes." She was asked whether, when she had crossed the second track, and taken a few steps forward, and leaned over to look north: "Was that the first time you had been in a position where you could look to the south?" To which she replied: "That was the first time; yes, sir." "But you didn't look to the south at that time, did you?" Answer: "I didn't get a chance." From the time she left the second track until the time she leaned over and looked north she had not, according to her testimony, reached a point where she could see either up or down the track. The court asked her: "Do you mean this: That you had not yet reached a point where you could see either up or down the track?" And her reply to that question was: "Yes, sir." "Up to that time you had been looking?" Answer: "Yes, sir." Again she was asked: "Did you ever get out to a point where you could see beyond the freight cars and look down the tracks?" And again she answered: "No." According to her testimony she had her eyes and ears wide open and was looking and listening all the time.

We think this testimony is so materially different from that which was given on the first trial that the ruling we made on the first appeal is not applicable to this appeal. There is evidence on this appeal that she stopped and looked and listened. Her testimony is that before she crossed the first track she stopped and looked and listened, and that she did the same thing before she crossed the second track, and that, having crossed the second track, and as she approached the third track, she again stopped and looked and listened, and that in order to see for any distance to the north, from which direction alone she heard any sound of an engine, she was obliged to lean over to look, and that while she thus stopped and looked and listened she was hit by an engine or cars which came from the south. If this testimony was true she simply leaned over so far that she brought her body so close to the third track that the overhang of the engine or cars moving on the third track, and which she did not hear, struck her. The fact that she was struck proves that she went too near the third track and actually projected her body into the danger zone. But is it to be said that, be-

cause she miscalculated the exact distance she could safely approach the third track without exposing herself to being hit by the overhang of cars moving on that track, she was as a matter of law guilty of gross negligence, notwithstanding the fact that she was looking and listening as best she could all the time from the moment she approached the first track to the time she was struck by the engine and cars on the third track, while she was standing between the second and third tracks? We think the question must be answered in the negative.

Again, much was made at the argument of the fact that this woman did not look to the south after she crossed the second track. There was testimony in the case to show that the conductor of the freight train that was on the siding at the time of the accident, which occurred on September 26, 1911, went to the scene of the accident some time in February, 1912, with a photographer and a civil engineer, and placed cars south of the crossing "just the same as they stood at the time of the accident," employing the same style of car that he had at the time the accident occurred. No views were taken on that day, and not until August 20, 1912. These photographs were introduced as exhibits, and the engineer testified that from a point 2 feet east of the eastern rail of the third track he could see down the track to the south some 3,000 feet. The importance of this testimony evidently did not impress the jury. And this court did not hold when the case was here before, and does not hold now, that as a matter of law and under the circumstances she was bound to look to the south. She testified that she had been looking in both directions, but as she stepped away from the second track and leaned over she looked north naturally, for she heard no sounds from the south and did hear a puffing engine at the north. Naturally any prudent person would have looked north under the circumstances, and would have continued doing so until satisfied whether danger was threatened from that direction. She knew it was a one-track railroad, and that when a train was going in one direction upon that one track no other train could go in the opposite direction at the same time. And she heard no sound in the opposite direction. In a somewhat similar case, where the party looked to the north at a railroad crossing and was hit and killed by a train which came from the south, the New York Court of Appeals said:

"We cannot say that at that particular time he should have looked toward the south. Under all the circumstances surrounding the accident, we think it was for the jury to determine whether he exercised that care which the law required of him." Kellogg v. N. Y. Central & Hudson R. R. Co., 79 N. Y. 72.

Upon the testimony as given at the second trial we think the question whether Annie Thierer was guilty of contributory negligence was for the jury to determine. If this court should arbitrarily say that a woman who stopped and looked and listened as this woman swears she stopped and looked and listened, in the exercise of her right to pass over this crossing, was nevertheless guilty of contributory negligence as a matter of law, we fear it would be calculated, as Judge Lurton said in the Farra Case, supra, "to condone carelessness and recklessness by railroad companies at public crossings, where the rights and duties of the public and of the company are reciprocal."

In the Farra Case, supra, the person injured did not stop to look and listen, but drove upon the track itself—went from a place of safety into a zone of danger—but the court held the question of contributory negligence was for the jury under all the circumstances of the case. So in the Ives Case, supra, the traveler without stopping to look and listen went from a place of safety into a zone of danger upon the tracks themselves, and the Supreme Court, as we have seen, made a like ruling. The rule applied in those cases should be applied in this. In this case the woman never went upon the third track. Before doing so she had stopped to look and listen, supposing that in doing so she was in a place of safety; but in bending over to see the third track to the north, as she was compelled to do to view the track, leaned too far and got into a zone of danger. And if it was proper in the two cases above cited to leave the question of contributory negligence to the jury when the persons injured actually went upon the tracks without stopping, surely no error was committed in the case at bar, when the woman never went upon the track, but stopped to look and listen in what she supposed was a place of safety, but which was in reality a place of danger, made so by the overhang of the engine and cars.

Judgment is affirmed in both cases.

LACOMBE, Circuit Judge (concurring). Plaintiff was found in fault on the former appeal, not because she looked first to the north instead of to the south. That she stopped and looked both ways while she was at a place where the cars on each side obstructed her view appeared on the first trial. The majority of the court reached the conclusion on the evidence then in the case that, when she reached a point just beyond the west rail of the middle track, the cars would no longer obstruct her view, and that there was the place where she should have stopped and looked both ways. The testimony on the second trial shows by actual measurement that from the point referred to, placing the cars as plaintiff said they were, there was an unobstructed view of 152 feet, quite sufficient, as the train was running slowly—about 6 miles an hour. The majority also understood from the record that, instead of stopping at that place to look both ways, she continued on while looking to the north till she came so near the third track which was 7 feet 7¼ inches from the second track, that she was hit by the train before she looked to the south. To me it seems that the testimony on this trial does not show that she did stop at all after reaching the place whence she could see up and down the track; but since my Associates are satisfied (as apparently the jury were) that she did stop after passing the second track I shall not dissent.